And our fifth case this morning is United States v. Fincher. Ms. Feigin. Good morning. May it please the Court. Whether a mandatory minimum applied here turned on whether or not Claudius Fincher possessed a firearm in connection with his drug offense. I'm going to start today by talking about the District Court's resolution of that question, rather than this constitutional issue of whether the judge should have been doing the fact-finding in the first place, since the Court avoids a constitutional issue if it can. Now, DNA evidence showed that at some point Claudius Fincher possessed a firearm. So, to get even more specific, whether the mandatory minimum applied here turned on the question of whether Fincher's possession of that firearm was connected to his two-month-long drug conspiracy that he was convicted of here. And there's this question underlying it of what does a District Court do when there's no real evidence that the possession of a gun was connected with the drug offense? Where there's just the sort of general inferential kind of evidence that one could make about guns and drugs that can be applied in any circumstance, but it's not necessarily applicable in any particular case. And on this particular issue, we're not asking the Court to change the law or change the standard, just to clarify a matter that this Court hasn't spoken on in the past. Because even with the defendant bearing the burden of proving that his possession of a firearm wasn't connected to his drug offense, there's still no presumption that there is a connection between the possession and the drug offense. So the District Court can't find that, as a matter of fact, there was this connection, which comes with truly profound legal consequences. Otherwise, if you have a possession of a firearm and you have a drug offense, then it's really sort of unprovable that there was no connection. A defendant at least can't prove that negative, again, given this general notion that this Court has talked about in many different contexts about the general relationship between firearms and drug dealing. And again, not always. It is just an inference that can be made in various situations. So without some sort of clarification on this point, we basically read the requirement of a connection out of the statute. So even with someone like Claudius Fincher, who had a legal right to possess a firearm at the time, we are presuming that any possession would have been connected to their drug offense. And essentially, mere possession of a firearm then makes the person inapplicable for 3553F and triggers the mandatory minimum in the drug laws. Wasn't that where the crime took place? Wasn't that a pretty unusual place? A very small apartment? I would say it's a pretty typical one-bedroom apartment. Well, typical, except it wasn't typical. It's not particularly furnished. The gun was found in the apartment. I realized it wasn't right next to the, I don't remember where the drugs were, but it turns out that the proximity and also the activity, this is a unique place. So you have a gun there, it's not good. Well, essentially what you have, it's two bachelor men living in a one-bedroom apartment. Television bed, it looks like one is sleeping on a sofa bed. There's a firearm in a kitchen drawer. There's plenty of other possessions in the home. And then also in this bedroom closet. Where were the bullets? The bullets, there were, I think it's three bullets. It's not clear from the record if they were bullets that had just been laying on the ground or if they were in a bullet box, but there were three bullets in the closet that the caliber matched the firearm. But that's sort of all we know about those bullets that would potentially connect them with the gun in the drawer. The gun in the drawer was certainly loaded, but it was, again, separated from the drugs in the house. So nobody looked to see if the loaded gun had the same kind of bullets, but I guess that doesn't matter. Right. I mean, I don't see how that adds anything to the notion that when Mr. Fincher possessed this gun, that possession was connected to the drug conspiracy that he was convicted of. Well, that finding is contained in the district court's opinion, basically concluding that this apartment was used for no other purpose than as a base for the drug dealing activities of the defendant and his partners in the conspiracy. Because the legal renter wasn't living there. She lived in Chicago, and it was used sporadically for these drug dealing activities based on its contents and its method of use. And what's clearly erroneous about that? Well, that finding is pretty confusing and definitely clearly erroneous based on this record. I mean, the discovery all shows this is where they were living. There was no other residence for Mr. Fincher or Mr. Brunt. This was their base and their home. There was, I think, the reason there was... It wasn't his primary residence. As far as we know, it was, yes. There's nothing in the record that there was somewhere else he lived. In Madison, that is where he was living, right? I should say Sun Prairie. So that finding was... The judge specifically says the apartment itself is not Fincher's primary residence. That's just a mistake? As far as I can tell, that's a misstatement. I think it's related to, in the pre-sentence report, there was some discussion of both defendants initially told police, No, we don't know what that apartment is. We don't know what's going on, as often happens in this kind of case. And so that created this discussion in the pre-sentence report tying these gentlemen to that apartment. But, again, there's nowhere else they lived. I don't think the parties disagree on the point that that was where they were. It wasn't some sort of standalone stash house, warehouse. They weren't making drugs in and out of it. Certainly drugs were found there. It's clear they were keeping drugs there. It's also where they were staying. Well, I don't know. I mean, there's other things. It wasn't the young man's uncle? Yes, Your Honor. And he was more active. And I assume if they show identification, driver's license and thing, they would show, did they show that address? Well, Mr. Fincher had only lived in the Madison area for a pretty short time. So I don't know what was on his driver's license. I assume it was probably his Chicago address, which is where he was from. But the bottom line is we don't want to create a presumption here that the lawful possession of a gun, we can just assume that that's connected to a drug offense. Wasn't it fairly clear from the factual record that he went to Madison to deal drugs? He wasn't there for some other purpose. No, Your Honor. He went to Madison to help his grandmother out, which is where he really got to know his uncle for the first time. His uncle was involved in the drug dealing business, and that's how he got swept up into this and made a pretty significant mistake. So he had an independent reason for moving there, if that's, in fact, what he did. Or was he just visiting? He was moving to Madison. He had left college, was trying to figure out what to do with his life, was helping out his grandmother at the time. Probably living with her house. I think he was living off and on there, potentially staying with friends and girlfriends, and then eventually was staying with his uncle, which was obviously a big mistake for him. So I'll just very briefly talk about the Sixth Amendment claim before I sit down. It's actually a pretty straightforward application of a lien. It's in this very unusual context, and it's pretty easy to see why courts have been hesitant to apply a lien in this context. But we have, clearly, judicial fact-finding that is altering the mandatory sentencing range in this case and in cases like it. The only real argument is that it doesn't raise mandatory minimums, it lowers the sentence. But 3553F is a mandatory limitation on mandatory minimums, and so these two statutes together are what established the sentencing range. In this case, and really in every drug case, it's just that in most cases, these facts are not in dispute. And so it's never going to be a problem. But 3553F is essentially a toggle switch that turns off the mandatory minimums in 841B1A and 841B1B. If we were going your way, what would the sequence be of the judicial fact-finding? Here, of course, we had the issue raised, Judge Peterson issuing the five- or six-page decision where he makes his findings. If we followed your approach, when would that occur in the sequence? I think this has to be addressed before the plea hearing and the trial. It could have been in this case if at the time anybody saw this coming. But at the time of the plea, the record is pretty clear that everyone believed there would be no mandatory minimum here. Everyone thought he was safety valve eligible. This is his very first arrest, his very first case. And it didn't look like there was going to be any other problem. It's only later that this developed, but in the future. When the DNA match came. When the DNA match came, showing that both he and his uncle had touched this firearm in the house. But in the future, this should be worked out before plea. And honestly, as much as we're talking about practical problems, I think practically that is the better time to work out these situations for both parties, really, but certainly for the defendant. Thank you. Thank you. Mr. Reinhart. Good morning. David Reinhart for the United States. Safety valve factors, I'll start with the Sixth Amendment argument, are classic sentencing factors. Here the district court safety valve findings did not increase his criminal exposure. It did not trigger his mandatory minimum. The drug quantity triggered the mandatory minimum in this particular case. And it did not increase his maximum sentence in the case. So there's no Sixth Amendment, a lien error. And every circuit that has addressed this very issue has rejected Mr. Fincher's claim. And 3553F specifically states that the court at sentencing has defined the relevant sentencing factors. And he pleaded to facts supporting the mandatory minimum. Correct. He pleaded to the 100 grams or more of heroin, which triggered the mandatory minimum. So some sort of background assumption that he was going to qualify for safety valve is just irrelevant to the alien question. Yeah, it was. And he didn't have a prior record, so that was certainly something that was on the table until, of course, we found the DNA on the firearm. Moving on to the second argument. Now, the argument is that if you find drugs and guns automatically, that you are safety valve ineligible. But that's not the case here. The district court looked at the entire record in this case. I mean, it's a fact-specific endeavor. And the court looked at the location of the firearm, the proximity of the firearm to the drugs in this case, the very nature of the firearm, that it's a handgun, that it was loaded, it was easily accessible, it wasn't locked away, and the quantity of drugs in this case. We're talking a large amount of heroin, 149 individually packaged bags of heroin-laced fentanyl. I mean, that's a substantial amount. What about this finding that the apartment itself is not Fincher's primary residence? What was that based on in terms of record support? Looking at the PSR paragraph 80, when he moved up to Madison, it shows that he lived with his girlfriend's mother for a period of time and then also at the Sun Prairie apartment prior to his arrest. So not his grandmother. It does mention that he went up initially to see his grandmother. But I think what the PSR indicates that it was his girlfriend's mother who he was staying with initially. I think what the court was getting at was the nature of this apartment, that it was very sparsely decorated and that the renter was not the renter or wasn't the two defendants in this particular case. How long had he been in town? I think it was a couple, two to three months in town. Where were the drugs located? The drugs were in a closet in a bedroom, in the one bedroom in the apartment. And the firearm was located adjacent to that in a kitchen drawer. Adjacent to the bedroom? Correct. I mean, this is an 800 square foot apartment. So very, in my opinion, a small apartment. Lastly, Fincher offered no, and the court noted this, no explanation for his possession of the firearm in this case. The court's entitled to make reasonable inferences based on the evidence, which uses common sense and experience, and it was a reasonable conclusion that the gun provided immediate protection for this large quantity of drugs in that apartment. The burden here is clear air. The defendant has not met that burden. If there aren't any further questions, I would rest on my brief and ask this court to affirm the district court. Thank you. Ms. Knight, you had a little bit of time. So there may be other parts of the pre-sentence report, but paragraph 80 sort of contains the most succinct. He came here to be with his grandmother. He got a new girlfriend. He was staying with her mom for a while. Then he moved to the Sun Prairie apartment that we're all talking about now. But, I mean, millions of Americans have firearms, mostly handguns. Many of them, maybe even most of them, are loaded in their homes, and so the question is what do we assume about their intention with those guns, and is the sort of fact of drug dealing and the fact of a smaller apartment, is that enough to allow the court to make a factual finding that, in this case, creates a five-year mandatory minimum for Mr. Fincher? Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement, and we're going to take a brief recess for a panel change before our final case this morning.